CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorney

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680
FAX: (510) 637-3724
Kelly.volkar@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARIO SEVILLA ARTIAGA and DANEXI MENDOZA LINCONA,<br><br>Defendants. | CASE NO. 4:26-CR-00093-JST<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: October 23, 2026<br>Time: 9:30 A.M.<br>Judge: Hon. Jon S. Tigar |

# TABLE OF CONTENTS

INTRODUCTION ....... 1

RELEVANT BACKGROUND ....... 2

I. Offense Conduct ....... 2

A. The Investigation and Execution of the Search Warrant ....... 2

B. Drugs and Firearm Found in the Common Areas ....... 2

C. Drugs and Other Evidence Recovered from Sevilla's Bedroom ....... 3

D. Drugs, Firearms, and Other Evidence Recovered from Mendoza's Bedroom and Closet ....... 3

II. Criminal History ....... 4

II. Procedural History ....... 5

SENTENCING GUIDELINES ....... 6

I. Sentencing Guidelines Calculation ....... 6

ARGUMENT ....... 7

I. Legal Standard ....... 7

II. The Government Recommends a Sentence of 108 Months of Imprisonment for Sevilla and 102 Months of Imprisonment for Mendoza Based on Application of Section 3553(a) Factors ....... 8

A. Nature and Circumstances of the Offenses ....... 8

B. History and Characteristics of Sevilla ....... 10

C. History and Characteristics of Mendoza ....... 11

D. Deterrence, Promoting Respect for the Law, Protecting the Public, and Providing Just Punishment ....... 13

E. Avoiding Unwarranted Sentencing Disparities ....... 15

CONCLUSION ....... 16

# TABLE OF AUTHORITIES

Cases

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) .................... 7
*United States v. Daychild*,
357 F.3d 1082 (9th Cir. 2004) .................... 14
*United States v. Kimbrough*,
522 U.S. 85 (2007) .................... 7

Statutes

18 U.S.C. § 3553(a) .................... 2, 7, 8, 15
21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi) .................... 5, 15
21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) .................... 5, 6

Rules

U.S.S.G. § 2D1.1(a)(5) and (c)(5) .................... 6
U.S.S.G. § 2D1.1(b)(1) .................... 7, 8
U.S.S.G. § 3E1.1 .................... 6

## INTRODUCTION

This case arises from the discovery of a large quantity of various narcotics and multiple firearms at the residence shared by Defendants Mario Sevilla Artiaga and Danexi Mendoza Licona.[1] Specifically, following an investigation by the Oakland Police Department (OPD) for toll violations connected to vehicles driving back and forth across the bridge between Oakland and San Francisco, OPD found approximately 1.58 pounds (over 700 grams) of fentanyl, 0.21 pounds (over 95 grams) of methamphetamine, 2.8 grams of heroin, and multiple firearms. Collectively, the defendants had the equivalent of more than 350,000 lethal doses of fentanyl in their possession.

The instant offense is not the first time either defendant has engaged in narcotics-related conduct. Both defendants have been arrested nearly a half dozen times for drug-related offenses, and Sevilla was recently convicted and sentenced to two years in state jail. Their respective previous encounters with the criminal justice system failed to deter either defendant from returning to similar conduct, this time involving substantial quantities of fentanyl and multiple firearms. These defendants now require a significant sentence to deter their repeated unlawful sale and possession with the intent to sell dangerous and highly addictive drugs.

While the Probation Office recommends 87 months of imprisonment for both defendants, and the government anticipates that defense counsel will argue for the low-end of the ranges provided in the respective plea agreements, those sentences do not adequately account for the sheer amount of drugs possessed, the number of firearms, the attempts to conceal the full extent of the drugs by tossing them out the window and shattering cell phone screens, and the underrepresented Criminal History Category of each of the defendants who have been undeterred despite more than half a dozen similar arrests. Balancing in the defendants' favor is their early and fulsome acceptance of responsibility, the fact that the sentences they will receive in this federal case will be more substantial by a long shot from any of their prior terms of incarceration, the fact that both defendants are undocumented and may face deportation after serving their term, and the unique mitigating facts of their backgrounds as shared with

[1] Defense counsel has informed the Government that Defendant Sevilla Artiaga prefers to be referred to as Sevilla, and that Defendant Mendoza Licona prefers to be referred to as Mendoza. As such, the government will use these preferred last names in its sentencing memorandum.

the government through the presentence investigation process.

For these reasons and those set forth in more detail below, and pursuant to 18 U.S.C. § 3553(a), the government respectfully recommends that the Court sentence **Sevilla to a 108-month term of imprisonment and Mendoza to a 102-month term of imprisonment**, each followed by four years of supervised release, forfeiture, and a $100 special assessment.

## RELEVANT BACKGROUND

### I. Offense Conduct

#### A. The Investigation and Execution of the Search Warrant

OPD's investigation began after officers learned that a vehicle associated with the defendants had fraudulently listed OPD's address in connection with unpaid Bay Bridge toll violations, causing OPD to receive the vehicle's toll-violation notices. Sevilla PSR ¶ 8; Mendoza PSR ¶ 7.[2] During the investigation, OPD officers identified the vehicle and attempted to stop it, but the vehicle fled from officers in a manner that disregarded the safety of others. Sevilla PSR ¶ 8. Officers subsequently identified a residence associated with the vehicle on International Boulevard in Oakland, where Sevilla and Mendoza lived. *Id.* OPD obtained a warrant to search the vehicle and residence, and requested assistance from Alameda County Narcotics Task Force (ACNTF) in executing the warrant. *Id.* ¶ 9.

On August 20, 2025, while officers knocked at the front door, law enforcement also used a drone to observe the rear of the apartment, which connected to an alleyway. *Id.* The drone captured on video an individual—subsequently identified as Sevilla—leaning out of the apartment's kitchen window and throwing a pistol and a large quantity of drugs into the rear yard. *Id.* Officers outside the apartment also heard glass shattering. *Id.* When officers eventually breached the apartment door, Sevilla and Mendoza exited the apartment and were detained without incident. *Id.*

#### B. Drugs and Firearm Found in the Common Areas

While searching the rear yard where Sevilla threw the handgun and drugs, officers recovered five sandwich baggies containing 20 smaller bags, each comprising approximately 29.2 grams of fentanyl—

[2] Because the information provided in the offense conduct section for both co-defendants is near identical, the government will cite only to the lead defendant's PSR for simplicity in this section. *Compare* Sevilla PSR ¶¶ 7–15, *with* Mendoza PSR ¶¶ 6–14.

totaling at least 557.58 grams of a mixture and substance containing a detectable amount of fentanyl—as well as a bag containing approximately 44.8 grams of methamphetamine. *Id.* ¶ 10; Dkt. 39 ¶ 2. Officers also recovered an un-serialized Glock 9mm handgun, equipped with a 17-round high-capacity magazine containing six rounds of 9mm ammunition, from the front basket of a bicycle in the alleyway. Sevilla PSR ¶ 10. In a post-*Miranda* interview, Sevilla admitted that he had thrown both the handgun and drugs from the kitchen window as officers executed the search warrant. *Id.* ¶ 14.

Officers recovered additional evidence from areas outside either defendant's bedroom. *See id.* ¶ 13. In the apartment's living room, officers located two boxes containing multiple money-transfer receipts listing the defendants' address and documenting money transfers to Honduras. *Id.* Officers also located a 2009 Mercedes C350 parked outside the apartment complex. *Id.* A search of the Mercedes yielded an additional 32.6 grams of fentanyl and materials used to cut fentanyl, including approximately 2.2 pounds of Mannitol dietary supplement powder, which is a supplement that can be used to dilute fentanyl and increase the quantity available for sale. *Id.*

### C. Drugs and Other Evidence Recovered from Sevilla's Bedroom

Officers recovered additional illegal substances and evidence of drug trafficking from Sevilla's bedroom. Specifically, officers found approximately 13.6 grams of fentanyl and 29.6 grams of methamphetamine, each individually packaged, as well as an electronic gold-colored scale. Sevilla PSR ¶ 11. Officers also located indicia associated with drug sales, such as packaging material, $6,637 in cash, and two Walkie-Talkies, as well as an identification belonging to Sevilla. *Id.*; Dkt. 39 ¶ 2. Law enforcement also found two cell phones with shattered glass screens. Sevilla PSR ¶ 11.

After his arrest, in a post-*Miranda* interview, Sevilla admitted that he had thrown both the handgun and drugs from the kitchen window as officers executed the search warrant. *Id.* ¶ 14. He also told officers that he had entered the United States illegally and incurred a substantial debt to a drug cartel. *Id.* Sevilla told law enforcement that he was directed to sell fentanyl to pay off his debt and, after satisfying his obligation, he continued selling fentanyl for profit. *Id.*

### D. Drugs, Firearms, and Other Evidence Recovered from Mendoza's Bedroom and Closet

The search of Mendoza's bedroom and closet revealed a separate cache of narcotics, firearms,

cash, and drug-trafficking materials. Officers recovered approximately 81.6 grams of fentanyl, 22.6 grams of methamphetamine, 2.8 grams of black-tar heroin, ten pills marked "M30," a black electronic scale, and paraphernalia used to mix or cut fentanyl. Mendoza PSR ¶ 11.

In addition to the narcotics and drug-related materials, officers recovered firearms from Mendoza's closet: an un-serialized handgun with a silver upper slide and black lower frame; a 9mm Raven Arms P25 handgun; and a CO2 revolver. *Id.* After his arrest, Mendoza admitted to knowing about the three firearms in his closet but claimed these did not belong to him. *Id.* ¶ 14. In a post-*Miranda* interview, Mendoza also told law enforcement he had done "bad things" when asked about the drugs. *Id.*

In total throughout the shared areas, bedrooms, and drugs that were tossed out the window, law enforcement recovered approximately 1.58 pounds of fentanyl, approximately 0.21 pounds of methamphetamine, 2.8 grams of heroin, and multiple firearms during the execution of the search warrant. Sevilla PSR ¶ 14; Mendoza PSR ¶ 13. The drug quantities are attributable to both Sevilla and Mendoza. *Id.*

## II. Criminal History

Sevilla and Mendoza have both been arrested multiple times in the past for possession with intent to sell drugs. Sevilla has been arrested seven times for drug-related offenses, with five of the instances involving Sevilla selling drugs or assisting others to sell drugs, mainly in the Tenderloin neighborhood in San Francisco, and five instances involving Sevilla or the person he was assisting possessing multiple different types of controlled substances for sale—including fentanyl, cocaine, methamphetamine, heroin, oxycodone—and various denominations of US currency in cash. Sevilla PSR ¶¶ 31–40. At least one of his arrests was also in violation of a stay-away order. *Id.* ¶ 37. Two of those arrests resulted in convictions, only one of which contributes to Sevilla's criminal history points. *Id.* ¶¶ 31–32. Sevilla received a sentence of 51 days' jail and 2 years' probation for a 2021 conviction, and was sentenced to 2 years in state jail in 2025 for similar conduct as to his current offense. *Id.*

Similarly, Mendoza has been arrested seven times for drug-related offenses, with five of the instances involving selling drugs or assisting others to sell drugs, mainly in the Tenderloin neighborhood in San Francisco, and, indeed, four of the arrests occurred within a two-week window in July 2023.

Mendoza PSR ¶¶ 35–41. Like Sevilla, Mendoza was frequently arrested while in possession of multiple types of controlled substances, including fentanyl, cocaine, methamphetamine, and heroin, along with indicia of distribution such as plastic baggies, various denominations of US currency, or electronic scales. *Id.* At least two of his arrests were in violation of previously imposed stay-away orders. *Id.* ¶¶ 35, 40. And one arrest in February 2024 occurred while Mendoza was on pretrial release pending two drug-related cases and on active GPS monitoring, from which law enforcement observed Mendoza frequenting an area with a high volume of drug sales in the Tenderloin neighborhood in San Francisco, specifically noting that Mendoza visited that area nearly 33 times within six days. *Id.* ¶ 36. Upon arrest, Mendoza once again had a variety of controlled substances, baggies, and cash on his person. *Id.* Mendoza's only prior conviction is for possessing a loaded semi-automatic Diamondback .380 handgun with one .380 caliber bullet, which were discovered after law enforcement pulled Mendoza over for driving recklessly. *Id.* ¶ 31. In addition, two days after his arrest for the underlying offense in this case, Mendoza led California Highway Patrol on a high-speed chase, reaching speeds over 100 MPH, and was ultimately arrested with a large amount of US currency in cash, two cell phones, and Mendoza and the other individual he was with had discarded a large amount of fentanyl. *Id.* ¶ 38.

**III. Procedural History**

On February 26, 2026, the government charged Sevilla and Mendoza with Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of a Mixture and Substance Containing Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(A)(vi) (Count One). Sevilla PSR ¶ 1; Mendoza PSR ¶ 1. The government also charged each defendant with Possession with Intent to Distribute a Mixture and Substance Containing Fentanyl: Sevilla was charged with possessing 400 grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi) (Count Two), while Mendoza was charged with possessing 40 grams or more, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) (Count Three). *Id.*

Both defendants were transferred into federal custody on March 3, 2026, and made their initial appearances before Magistrate Judge Laurel Beeler. Sevilla PSR ¶ 5; Mendoza PSR ¶ 4. Both defendants subsequently waived their rights to detention hearings and were remanded into custody pending trial. *Id.*

On June 1, 2026, the government filed a one-count Superseding Information, charging Sevilla with Conspiracy to Distribute and Possess with Intent to Distribute 40 Grams or More of a Mixture and Substance Containing Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B)(vi). Sevilla PSR ¶ 2. On June 12, 2026, Sevilla pleaded guilty to that count. *Id.* ¶ 3; Dkt. 39.

On July 8, 2026, Mendoza pleaded guilty to Count Three of the Indictment, charging Possession with Intent to Distribute 40 Grams or More of a Mixture and Substance Containing Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi). Mendoza PSR ¶ 2.

Sentencing for both defendants is scheduled for October 23, 2026. Sevilla PSR ¶ 6; Mendoza PSR ¶ 5.

## SENTENCING GUIDELINES

### I. Sentencing Guidelines Calculation

The Government agrees with Probation's offense-level calculation, which is as follows:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2D1.1(a)(5) and (c)(5) | 30 |
| b. | Specific Offense Characteristics, Ch. 2 U.S.S.G. § 2D1.1(b)(1) (possessed firearm) | +2 |
| c. | Acceptance of Responsibility, U.S.S.G. § 3E1.1 | -3 |
| d. | Adjusted Offense Level: | 29 |

Sevilla PSR ¶¶ 19–29; Dkt. 39 ¶ 7; Mendoza PSR ¶¶ 18–28; Dkt. 42 ¶ 7.

The parties also agreed, and Probation agrees, that Mendoza is a Criminal History Category I based on his one prior conviction. Mendoza PSR ¶¶ 31–34; Dkt. 42 ¶ 7. A total offense level of 29 and Criminal History Category I result in an advisory Guidelines range of 87 to 108 months of imprisonment, with a statutory mandatory minimum of 60 months' imprisonment. Mendoza PSR ¶¶ 58–59.

Similarly, the parties agreed that Sevilla is a Criminal History Category I. Dkt. 39 ¶ 7. Probation initially calculated a higher CHC, but resolved defense's objection in Sevilla's favor, and joins the parties' CHC I calculation in the final PSR. Sevilla PSR ¶¶ 31–34. The government was unaware of one of the conviction records that Probation has included (*id.* ¶ 32), but stands by its

agreement in the plea agreement finding Sevilla to be CHC I. In any event, as argued herein, the government believes both defendants' criminal histories are under-representative given each of their respective number of arrests for similar conduct that did not lead to convictions. *See* Sevilla PSR ¶¶ 31–40; Mendoza PSR ¶¶ 31, 35–40. With a CHC I and total offense level of 29, Sevilla also faces an advisory Guidelines range of 87 to 108 months of imprisonment, with a statutory mandatory minimum of 60 months' imprisonment. Sevilla PSR ¶¶ 57–58.

The U.S. Probation Office recommends the same sentence for both defendants—87 months of imprisonment. Sevilla PSR Recommendation; Mendoza PSR Recommendation.

The parties agreed in a binding plea agreement to slightly different ranges. For Sevilla, the parties agreed that a custodial sentence between 84 and 120 months would be appropriate. Dkt. 39 ¶ 8. And, for Mendoza, the parties agreed that a custodial sentence between 78 and 114 months would be appropriate. Dkt. 42 ¶ 8.

## ARGUMENT

### I. Legal Standard

The United States Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include (among other factors):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II. The Government Recommends a Sentence of 108 Months of Imprisonment for Sevilla and 102 Months of Imprisonment for Mendoza Based on Application of Section 3553(a) Factors

Based upon a consideration of the U.S. Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends a custodial sentence of 108 months' imprisonment for Sevilla and 102 months' imprisonment for Mendoza, each to be followed by a four-year term of supervised release subject to the standard conditions and other special conditions proposed by Probation. Consistent with 18 U.S.C. § 3553(a), these sentences are sufficient, but not greater than necessary, to reflect the seriousness of the offenses and to provide deterrence, but also to account for relevant mitigating factors, as described below.

### A. Nature and Circumstances of the Offenses

The nature and circumstances of the defendants' offenses warrant substantial punishment. Sevilla and Mendoza possessed significant quantities of fentanyl—more than 700 grams—methamphetamine—nearly 100 grams—and heroin, together with the tools of narcotics distribution and multiple firearms. The combination of large quantities of dangerous controlled substances, evidence of distribution, and firearms substantially aggravates the seriousness of their conduct. Collectively, the seized drugs in this case included several thousand individual doses of fentanyl and nearly a thousand individual doses of methamphetamine.

The dangerous nature of the controlled substances involved underscores the gravity of the defendants' conduct. Fentanyl is the most dangerous drug to impact the community in decades since it is approximately 50 times more potent than heroin and 100 times more potent than morphine. *See* Drugs.com, *Fentanyl* (last updated September 24, 2026), https://www.drugs.com/fentanyl.html (last accessed October 6, 2026). Even as little as 2 milligrams (.002 grams) can be lethal. *See* United States Drug Enforcement Administration, *One Pill Can Kill* (updated October 5, 2026), https://www.dea.gov/onepill ("2mg of fentanyl can be enough to kill an average American").

The fentanyl attributable to both defendants is equivalent to 357,850 potentially deadly doses. By comparison, the population of Oakland, California, is a little over 440,000 residents, and it is one of the largest cities in California. *See* https://www.census.gov/quickfacts/oaklandcitycalifornia (last visited October 16, 2026). That means Sevilla and Mendoza had enough fentanyl in their shared

residence to constitute lethal doses for approximately 80% of the residents of Oakland, the city in which they lived. In San Francisco, California—where Sevilla and Mendoza both have previously been arrested numerous times for selling controlled substances—fatal overdoses rose from 222 deaths in 2017 to 726 deaths in 2020 and reaching a height of 810 deaths in 2023 before dropping somewhat to 625 in 2025. https://www.sfchronicle.com/projects/san-francisco-drug-overdose-deaths/ (last updated October 7, 2026).

The dangers associated with the drugs recovered from defendants' residence are not abstract. For example, fentanyl overdoses are the leading cause of death for adults between the ages of 25 and 54 in Contra Costa County. *See* Contra Costa Health, "OD Free Contra Costa," https://www.cchealth.org/health-and-safety-information/od-free-contra-costa (last accessed October 6, 2026). In addition to fentanyl, officers recovered 0.21 pounds of methamphetamine, a highly addictive substance that is the second most commonly identified drug among people who die from drug overdoses. *See* National Institute on Drug Abuse, "Methamphetamine," (updated November 2024), https://nida.nih.gov/research-topics/methamphetamine#overdose-crisis (last accessed October 6, 2026). In total, the 97 grams seized from the defendants' shared living space would equate to 970 individual doses (with 0.1 grams being considered an individual amount).

In addition to the volume of drugs seized and the multiple types of drugs and individually packaged nature, Sevilla's attempt to dispose of a loaded firearm and substantial amounts of fentanyl—more than half a kilo—and methamphetamine further aggravates the seriousness of his offense. As officers arrived to execute the search warrant, a drone conducting surveillance observed Sevilla throwing a handgun and multiple bags containing fentanyl and methamphetamine through the kitchen window. The search of Sevilla's bedroom revealed additional fentanyl and methamphetamine, along with other evidence of narcotics distribution, such as packaging material, baggies, etc. Sevilla's direct possession of illegal substances and a firearm, as well as his attempt to dispose of that evidence as law enforcement arrived, supports the government's recommendation of a comparatively higher sentence as compared to his co-defendant. A high-end Guidelines sentence of 108 months' of imprisonment reflects the seriousness of this offense and Sevilla's comparative role in trying to dispose of evidence.

Mendoza's conduct was likewise serious and involved an even broader assortment of narcotics

and firearms. Officers recovered from his bedroom and closet three handguns; 81.6 grams of fentanyl; 22.6 grams of methamphetamine; 2.8 grams of black-tar heroin; and ten pills marked “M30,” which are used to “cut” narcotics. The M30 pills are particularly concerning given the prevalence and dangers of counterfeit pills containing illicitly manufactured fentanyl. According to the Centers for Disease Control and Prevention, the percentage of overdose deaths with evidence of counterfeit-pill use in western jurisdictions more than tripled from 4.7% in the third quarter of 2019 to 14.7% in the fourth quarter of 2021. *See* Julie O’Donnell et al., Drug Overdose Deaths with Evidence of Counterfeit Pill Use—United States, July 2019–December 2021, 72 Morbidity & Mortality Weekly Report 949, 949–56 (2023). Cumulatively, the quantity and variety of narcotics, materials used to prepare those narcotics for distribution, and multiple firearms demonstrate the scope and seriousness of Mendoza’s drug-trafficking conduct.

**B. History and Characteristics of Sevilla**

Sevilla’s history and characteristics present both mitigating and aggravating considerations. He experienced significant hardship growing up in Honduras and after coming to the United States at a young age, including poverty, abuse, violence, and financial pressure to support himself and his family. *See* Sevilla PSR ¶¶ 42–54. He has also expressed remorse for his conduct and described the impact of his incarceration on his family. *Id.* Sevilla is undocumented and may face deportation after he serves his term of imprisonment in the United States. The government has taken into account the mitigating evidence revealed in greater detail in the PSR and in materials provided by defense counsel, and, as a result, is recommending a sentence 12 months less than the high end of the range agreed to in the binding plea agreement (108 months versus 120 months). *See* Dkt. 39 ¶ 8.

However, those mitigating considerations must be weighed against Sevilla’s significant and persistent history of narcotics-related conduct. He has been arrested nearly half a dozen times for similar conduct, and yet his most recent two-year state jail conviction did not sufficiently deter him. *See* Sevilla PSR ¶¶ 31–40. His criminal history includes prior offenses involving possession and possession for sale of controlled substances, involving a variety of drugs, including fentanyl, cocaine, cocaine base, and methamphetamine, as well as assisting others in similar conduct. In one prior incident, Sevilla was arrested on an outstanding felony warrant while also in violation of a stay-away order. A search incident

to that arrest revealed cocaine, cocaine base, and $509 in his possession. The instant offense is not an isolated incident, nor can it be claimed that it stemmed from a misguided decision made in the moment while under the influence of drugs or alcohol. Sevilla's history shows that he engaged in a pattern—across several years—of selling drugs in the Tenderloin in San Francisco, during the height of the overdose crisis that has plagued San Francisco for the better part of the last decade. *See* https://www.sfchronicle.com/projects/san-francisco-drug-overdose-deaths/ (last updated October 7, 2026). While Sevilla told law enforcement that he originally began selling fentanyl to satisfy a debt obligation, he also admitted that he continued to do so after satisfying that debt to make money. Sevilla PSR ¶ 14. Sevilla sought to profit off of others' addiction.

Therefore, the instant offense cannot reasonably be characterized as an isolated lapse in judgment or conduct arising solely from difficult circumstances. Sevilla's history reflects a persistent pattern of narcotics trafficking despite repeated intervention by law enforcement and the criminal justice system. Those prior arrests provided repeated opportunities for Sevilla to change course, but they did not deter him from returning to drug trafficking. And the present offense is particularly concerning because it involves large amounts of fentanyl and a firearm, with Sevilla attempting to dispose of this evidence as law enforcement executed the search warrant. Thus, his history demonstrates both the seriousness of his continued conduct and the need for a sentence capable of providing the deterrence that prior interventions have not.

**C. History and Characteristics of Mendoza**

Mendoza's history and characteristics similarly present both mitigating and aggravating considerations. Mendoza, too, experienced challenges growing up and after coming to the United States at a young age. Mendoza PSR ¶¶ 43–55. He grew up without a father, had limited educational opportunities, and reports that those circumstances contributed to his initial involvement in drug trafficking. *Id.* In contrast to his co-defendant, Mendoza "became obsessed with the idea of leaving to the United States to live with his father" despite his mother's protest against it. *See id.* ¶¶ 44–45. In 2022, he welcomed his first child, and in 2024 welcomed a second with his current partner. *Id.* ¶¶ 46–47. He now identifies his partner and young daughter as important sources of stability and has expressed a desire to return to his family. *Id.* Mendoza informed Probation that he began selling drugs

to provide for his family. *Id.* Mendoza is also undocumented and may face deportation after he serves his term of imprisonment in the United States. The government has taken into account the mitigating evidence revealed in greater detail in the PSR, and, as a result, is recommending a sentence 12 months less than the high end of the range agreed to in the binding plea agreement (102 months versus 114 months). *See* Dkt. 42 ¶ 8.

Balancing against these mitigating characteristics is Mendoza's undeterred drug trafficking in the Tenderloin neighborhood in San Francisco, California. Although Mendoza has only one, non-drug-related prior criminal convictions, his history nevertheless reflects repeated contacts with law enforcement involving drug trafficking. *See* Mendoza PSR ¶¶ 35–41. In July 2023, Mendoza was arrested on at least four occasions within a two-week period during which officers repeatedly recovered various drugs and denominations of US cash, including heroin, cocaine, fentanyl, methamphetamine and cocaine base from his person. *Id.* As described above with respect to his co-defendant, Mendoza was repeatedly found selling narcotics in the Tenderloin in San Francisco during the height of the overdose epidemic. *See* https://www.sfchronicle.com/projects/san-francisco-drug-overdose-deaths/ (last updated October 7, 2026) (noting height of 810 overdose deaths in San Francisco in 2023). At least two of his arrests were in violation of previously imposed stay-away orders. Mendoza PSR ¶¶ 35, 40. And, in February 2024, law enforcement observed Mendoza via GPS monitoring on pretrial release for two drug-related cases loiter and frequent nearly 33 times within six days a high drug sales part of the Tenderloin neighborhood. *Id.* ¶ 36. Upon arrest, Mendoza once again had a variety of controlled substances, baggies, and cash on his person. *Id.* In another incident that occurred only two days after the instant offense, he was arrested following a high-speed attempt to evade law enforcement, after which officers recovered a substantial quantity of fentanyl that had allegedly been discarded. *Id.* ¶ 38.

Despite not resulting in convictions, the repeated nature of these prior arrests is relevant to the Court's consideration of Mendoza's history and characteristics. Despite repeated encounters with law enforcement arising from alleged drug trafficking, Mendoza again engaged in conduct involving large quantities of fentanyl, other controlled substances, and multiple firearms. The instant offense therefore cannot be viewed in isolation and demonstrates the need for a sentence sufficient to provide meaningful deterrence.

### D. Deterrence, Promoting Respect for the Law, Protecting the Public, and Providing Just Punishment

Significant sentences are warranted to promote respect for the law and provide just punishment. Lengthy sentences are also necessary for each defendant to afford adequate deterrence and protect the public from Sevilla and Mendoza. In this case, the need for specific deterrence is among the strongest considerations supporting the government's recommended sentences. The government asserts that the Criminal History Category of both defendants is vastly under-representative of their true past conduct. On the other hand, weighing in favor of leniency is the fact that both defendants nearly immediately accepted responsibility for their actions and, within approximately four months of being charged federally, changed their plea. *Compare* Dkt. 1, *with* Dkt. 39, *and* Dkt. 42.

Both defendants had been arrested nearly half a dozen times by law enforcement relating to narcotics trafficking before committing the instant offense. Those encounters provided repeated opportunities to change course. Neither defendant did so. Instead, both returned to substantially similar conduct, demonstrating that prior law-enforcement intervention was insufficient to deter them and that more substantial consequences are now necessary. Just punishment must take into account the defendant's decision to continue his course of criminal conduct notwithstanding multiple interventions from law enforcement.

That conclusion is particularly compelling for Sevilla. His involvement with the criminal justice system repeatedly placed him on notice of the seriousness and potential consequences of narcotics trafficking, yet he continued to engage in substantially similar conduct. Prior arrests, convictions, and custodial sentences did not deter him. The instant offense represents not an aberration, but a continuation of that pattern, now involving significant quantities of fentanyl and other controlled substances and access to firearms. A significant custodial sentence is necessary because lesser interventions have repeatedly proven insufficient to deter him.

Mendoza has not incurred any prior drug-related convictions—despite his many arrests—and has only served one day in local custody. But Mendoza has also been arrested half a dozen times for drug-related offenses, largely drug sales in the Tenderloin, and those encounters with law enforcement were not insignificant. Mendoza had repeatedly been arrested in circumstances involving alleged narcotics

trafficking and therefore had repeated notice of the consequences that could follow from continuing to engage in such conduct. Yet even repeated arrests did not cause him to change course. He again engaged in narcotics trafficking. Although Mendoza's lack of prior convictions distinguishes him from Sevilla, his repeated return to the same type of conduct demonstrates that prior law-enforcement intervention alone was not enough to deter him.

The risk to the public posed by firearms and drug offenses has been well-established. *See United States v. Daychild*, 357 F.3d 1082, 1100 (9th Cir. 2004) (stating that "danger posed to the public by armed conspirators who traffic in illicit drugs is too plain to permit dispute."). Not only did Sevilla and Mendoza collectively possess substantial quantities of multiple deadly drugs, they each had a firearm—or multiple firearms—alongside their trade. Possessing significant quantities of fentanyl with the intent to distribute presents a serious danger to the community, particularly when accompanied by firearms. Meaningful custodial sentences communicate to others engaging in similar conduct that repeated narcotics trafficking carries serious consequences. They also protect the public where, as here, prior law-enforcement intervention has failed to prevent continued drug-related conduct.

As noted above, it is particularly important to note that much of Sevilla's and Mendoza's drug trafficking has occurred during the height of an ongoing overdose epidemic in San Francisco, including in 2023 when San Francisco lost over 800 lives, with many of those deaths having a nexus to the Tenderloin neighborhood where the defendants were frequently arrested with a variety of drugs. The defendants were distributing deadly poison directly to suffering addicts, feeding an addiction whose ultimate end is suffering and death. The Court should impose a sentence that will deter other would-be Tenderloin drug traffickers from engaging in activity in that neighborhood. Furthermore, given the defendants clearly commuted from Oakland, where they lived, to the Tenderloin, where they worked by selling drugs, the Court's sentence will send a strong message of deterrence to others thinking about engaging in similar conduct.

The government's recommended sentences appropriately account for these considerations while recognizing the differences between the defendants. A sentence of 108 months' imprisonment for Sevilla reflects his more significant criminal history, his repeated failure to be deterred by prior convictions and law-enforcement intervention, and his conduct in the instant offense—including trying

to discard the majority of the drugs before law enforcement entered the apartment. A sentence of 102 months' imprisonment for Mendoza similarly provides meaningful punishment and deterrence while accounting for the fact that his prior cases did not result in convictions. Their histories demonstrate that prior interventions were not enough. The recommended sentences provide the substantial deterrent consequences that the defendants' repeated conduct now warrants.

**E. Avoiding Unwarranted Sentencing Disparities**

The government's recommendations also appropriately account for the need to avoid unwarranted sentencing disparities while recognizing meaningful differences between the defendants' conduct and histories. First and foremost, as the Indictment indicates, the amount of fentanyl that the two co-defendants collectively possessed is punishable by statute with a ten-year mandatory minimum. *See* 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(A)(vi). Furthermore, the firearms found with the drugs could trigger additional, mandatory consecutive sentences under 18 U.S.C. § 924(c). The government acknowledges that that mandatory minimum would have required a sentence higher than the applicable Guidelines in this case. Second, according to the Sentencing Commission's JSIN data, in the last five fiscal years, the average and median custodial sentences imposed for defendants with an Offense Level of 29 and a Criminal History Category of I, whose primary Guideline was §2D1.1 with fentanyl as the primary drug type, were 66 to 67 months, respectively. Sevilla PSR ¶ 74; Mendoza PSR ¶ 75. The Probation Office implicitly acknowledges that the JSIN data is under-representative of the full scope of conduct here, as it recommends 87 months' imprisonment for both co-defendants. Although the government's recommendation is on the higher end of the Guidelines range, this is warranted as defendants possessed large amounts of fentanyl and several firearms, and both have histories of prior law-enforcement intervention related to narcotics sales.

At the same time, § 3553(a) does not require identical sentences for defendants whose conduct and histories differ in material respects. Sevilla has a more significant criminal history, including prior narcotics-related convictions, and the evidence in this case establishes his direct responsibility for the narcotics and firearm he was observed discarding as officers executed the search warrant (and two phones with shattered glass screens were found in his room). In contrast, Mendoza's prior narcotics-related cases have not yet resulted in convictions and he was not actively discarding or disposing of

evidence when law enforcement arrived. These distinctions support the government's recommendation of 108 months for Sevilla and 102 months for Mendoza.

The six-month difference appropriately reflects Sevilla's greater culpability and more significant criminal history while recognizing that both defendants engaged in serious conduct warranting substantial terms of imprisonment.

## CONCLUSION

For the foregoing reasons, the government respectfully recommends that the Court sentence Sevilla to 108 months' imprisonment, followed by a four-year term of supervised release, and Mendoza to 102 months' imprisonment, followed by a four-year term of supervised release, forfeiture, and a $100 special assessment. These sentences are sufficient, but not greater than necessary, to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

DATED: October 16, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_______*/s/ Kelly I. Volkar*________
KELLY I. VOLKAR
Assistant United States Attorney